STATE v. JOHN ROGERS.

*Indictment—Murder—Judge's Charge.*

1. To render the act of killing excusable, on the ground of self-defence, the prisoner should have reasonable ground to apprehend, and should actually apprehend, that his life is in danger or that deceased is about to do him some great bodily harm ; but it is for the jury, and not for the prisoner, to judge of the reasonableness of such apprehension.

2. It is held as a general rule that the failure of the Judge to charge the jury on a certain point, unless requested so to charge, is not error. But it is his duty under The Code, §413, to state clearly the particular issues arising on the evidence, and on which the jury are to pass, and to instruct them as to the law applicable to every state of facts which they may find from the evidence.

3. Where there are divers witnesses, and the testimony is conflicting, it is error in the Judge to single out a single witness who is contradicted by other wit-

nesses, and to instruct the jury that if they believe the testimony of such witness, then the prisoner was guilty of murder.

4. When there is a conflict of testimony which leaves a case in doubt before the jury, and the Judge uses language which may be subject to misapprehension and is calculated to mislead, this Court will order a *venire de novo*.

(*State* v. *Scott,* 4 Ired., 409 ; *State* v. *O'Neal,* 7 Ired., 251 ; *State* v. *Dunlap,* 65 N. C., 288 ; *State* v. *Jones,* 87 N. C., 547 ; *State* v. *Matthews,* 78 N. C., 523 ; *Anderson* v. *Cape Fear Steamboat Company,* 64 N. C., 399 ; *Jackson* v. *The Commissioners,* 76 N. C., 282 ; *Brem* v. *Allison,* 68 N. C., 412 ; *State* v. *Bailey,* 1 Winston, 137, cited and approved).

INDICTMENT for murder, tried before *Graves, Judge,* and a jury, at Spring Term, 1885, of the Superior Court of NORTHAMPTON County.

The following is the substance of the evidence offered on the part of the State:

Dr. I. T. Eldridge was examined as a witness for the State, who was admitted to be an expert, and he testified that the deceased Millard Peebles died of wounds inflicted upon the left side of his head. The symptoms, he said, indicated a depression caused by a traverse wound on the head, above his left ear, an inch and one-fourth in the flesh, and three-fourths in the skull, causing a fracture of the outer table of the skull. A little lower down, a small penetrating wound ran three inches into the skull. The wounds were made with some sharp instrument. After the knife, a common Rogers pocket knife, was produced, which was said to be like that the prisoner had exhibited as the one with which he said he had inflicted the wounds, the witness said neither of the wounds could have been inflicted with such a knife. The force used to produce the wounds would have broken the blade. The blade, in his opinion, could not have made the smaller wound, for the bone is there hard and thick.

Doctor Moore, introduced by the State, concurred with the opinion of Dr. Eldridge.

Joseph I. Lassiter, a witness for the State, testified that he did not see the commencement of the difficulty between the prisoner and deceased. When he rode up to the crowd, he said the pris-

oner ran around the crowd and stabbed Mr. Peebles; Wilkins Powell had hold of Mr. Peebles; he went eight or ten steps around and stabbed him twice on the left side of his head; he saw a blade in his hand, but could not tell what kind of a blade it was; he got down off his horse and said, "what did you hold that man and let the negro stab him for?" On cross-examination, he said he saw the knife, and it looked larger than the blade of a common pocket knife, and said : "I do not say it was a pocket knife; I said it did not appear like the little blade of a pocket knife; I said it looked larger than a pocket knife." He was ten steps off, and did not see Peebles strike prisoner; saw a pistol drop from the hands of Peebles; did not remember how Powell was holding Peebles, but he was in front and had hold of his arms.

William C. Faison, a witness in behalf of the State, stated that Peebles and Boyce, at a race, had a little scuffle, in which the coat of Boyce was torn, but it was soon satisfactorily settled. The prisoner said, "if a man had treated me in that way, he would have had me to whip;" witness said, "what have you to do with it?" and told him he had better keep his mouth out of other people's business; he said nothing; witness, soon after this, told Peebles what the prisoner had said; they were eight or ten steps off; Peebles asked prisoner what business it was of his, and told him to keep his mouth out of his business; prisoner replied, "my mouth is my own, and I will use it when I damned please;" Peebles turned towards him and they seemed to go to fighting; witness was thrown back and separated from them for a half a minute; when he got back, he saw prisoner strike Peebles on the side of the head; Peebles was cut, and Wilkins Powell had hold of Peebles, and witness told him to turn him loose; he said he was as good a friend of Peebles as he was; witness did not see any weapon at all, and if they were separated, he did not see it; he was thrown back so that he could not see; he denied having given a pistol to Peebles on the occasion; witness said he did not remember seeing John Fann, and he had no recollection of tell-

ing him to turn Peebles loose; witness said Lassiter was sober at the race, though he may have got "mixed up" after; he could not say they were all sober; they all seemed capable of attending to business when he left; he himself had taken one or two drinks.

One McSparrin, introduced by the State, stated that he saw the difficulty. He saw Peebles walk up to the prisoner and ask him what he had to do with it?—and he replied, "nothing, only he just said so," and Peebles struck at him. They were separated. Prisoner was carried around the crowd, and John Fann had hold of Peebles and let him go. Peebles stood still a short time, maybe one-half minute, and seeing prisoner approaching, he went towards him and struck at him, and prisoner struck him one lick with his right hand, and W. Powell went towards Peebles as if going to take hold of him—thought he did not take hold of him before he was struck. He did not see him have hold of him afterwards.

Wilkins Powell, a witness for the State, testified that he saw the fight between prisoner and Peebles; he heard Peebles ask prisoner what he had to do with it? and prisoner replied, "nothing, boss." The next thing the witness saw, they were together and seemed to be knocking. Fann took hold of Peebles, and Faison said turn him loose—the prisoner backed and Peebles drew his pistol and said, "the d—d scoundrel has cut me." Peebles drew his pistol with his right hand—it did not drop, he put it back in his pocket. Witness stated that he did not take hold of Peebles until he had thrown prisoner back.

Several witnesses were examined by the State, who concurred in stating that they saw prisoner soon after the rencounter, in flight, about one-half mile from the place where it had occurred, and he said William Peebles had struck him three times, and he cut him three times and had tried to cut his throat.

W. B. Boyce, a witness for the State, on his examination, stated that he saw Faison when he took Peebles aside, and about that time prisoner came up to him and asked him to lend him his pistol; he told him he had none. He did not say what he wanted

with it, but said he was going to get into a difficulty. Witness said he told prisoner he thought Faison gave Peebles something. Something passed, but did not say it was a pistol.

The night after the fight the prisoner came to his house, and asked him to come out. Witness asked him what he stabbed that man for; he said he thought he was going to shoot him, and he tried to cut his throat. He showed me the knife he said he used. It was a Rogers knife, and he said he had used the little blade. There was no blood on the knife. Witness said he was in his house about twenty feet off, and saw all the fighting. Peebles struck at prisoner first, and he knocked off the lick; he struck at him again, but did not strike him. Prisoner at that time did not strike Peebles. They were then separated. John Fann held Peebles, and Faison told him if he did not turn him loose, he would shoot him. Tom Mason took hold of prisoner, and took him off about some twenty feet. About fifteen feet from where this rencounter took place, he saw Peebles and prisoner near together. Peebles went up to prisoner and struck him. Prisoner then stabbed him. He struck two blows, and was about to strike the third time, when Wilkins Powell ran in and took hold of Peebles, and knocked up prisoner's hand and pushed him back, and he ran off across the field. Peebles did not draw his pistol until after he was cut.

Tom Person, a witness introduced for the defence, stated that after the race he heard some one say, "I am going up yonder and beat that d——d negro," and when Peebles came to prisoner and said, "What have you to do with my and Boyce's business?" prisoner replied, "Nothing, boss, more than I said if a man had torn my coat that way, I should not have liked it." Peebles then struck him a pretty good blow, and pushed him with the other hand, and he knocked the lick up. John Fann took hold of Peebles, and Tom Mason of prisoner, and parted them. They walked around the crowd, and Peebles struck the prisoner with his left hand. In the first engagement, the prisoner did not strike, he only warded off the blow. In the second, they seemed

to clinch, and Wilkins Powell ran in and threw prisoner back, he then ran off half bent, looking back. Just as Wilkins got there, and I saw prisoner running, I heard Lassiter say, "Are you going to hold that man and let the other kill him?"

John Fann, a witness for the prisoner, testified that Peebles came up to prisoner and asked him what he had to do with his and Boyce's business; he replied, "Nothing, boss," and began to apologize, when Peebles struck him; he struck him twice, and he took hold of Peebles, and told him not to do that, and carried him back to about the wheel track; Faison said, if he did not turn him loose, he would shoot him, and he did turn him loose, and Peebles then went down to the prisoner and struck him with his left hand—prisoner struck him three times—W. Powell then threw him back and took hold of Peebles. After prisoner ran, Peebles said, "If you had not held me, I would have shot him."

Cullen Hayley, examined for the prisoner, stated that he heard Peebles ask prisoner what he had to do with his and Boyce's business; he replied, " nothing boss, I ask your pardon," and Peebles struck him with his right hand, and struck at him again, and prisoner knocked up the lick, and John Fann took hold of Peebles and ran him back, and some one ran the prisoner back; Faison told Fann to let Peebles go, or he would shoot him; he turned him loose and in half a minute he went over on the right of the road towards the prisoner. When they met, Peebles struck the prisoner one or two licks with his left hand; the prisoner struck Peebles twice; Wilkins Powell took hold of Peebles and held his pistol, and Peebles said, "you are a friend to me, for if it had not been for you, I would have shot the negro."

J. E. Mastin, a witness for the prisoner, testified that he got on the fence near the crowd; the crowd was drunk; Peebles passed him; he went up to the prisoner and said, "damn you, what have you to do with me?" and slapped him with his left hand; his right hand was down by his side, and prisoner immediately struck him twice; he did not think that the prisoner ad-

vanced until Peebles struck; he did not see the first engagement; was then looking for his horse; he did not see Wilkins Powell until he shoved prisoner back; witness knows the character of John Fann; it is good, where he was raised and where he now lives.

I. B. Bridgers was introduced as a witness for the State. He stated that he saw both difficulties; was some distance off at first rencounter; saw John Fann have Peebles, and Mason shoved the prisoner; they met at the lower end of the crowd; Peebles struck a back-handed lick, as if he was warding off a blow, or giving him a blow in the mouth; prisoner struck two or three licks, and Powell ran in, and prisoner seemed to strike around Powell; witness was ten feet off when Powell ran in between them; Peebles seemed to strike with his open hand, and almost at the same time prisoner struck him; Peebles was between witness and Powell, and Powell between witness and prisoner.

At the close of the testimony, the prisoner's counsel asked his Honor to charge the jury " that if the prisoner thought that he would be shot if he did not cut, and that he did cut to protect himself, then the killing was justifiable homicide, and the jury should return a verdict of not guilty." His Honor declined to give the charge, but instructed them " that it is for the jury to say whether there was reasonable ground for the prisoner to apprehend danger."

There was a verdict of guilty of murder, and from the judgment thereon the prisoner appealed.

*Attorney General*, for the State.
*Messrs. Peele & Maynard* and *B. S. Gay*, for the defendant.

ASHE, J., (after stating the facts). There was no error in this ruling. It is founded on a principle too well and too long settled, to admit of a question. This was the only instruction asked by the prisoner before the case was submitted to the jury, but after the verdict, his counsel filed a number of exceptions to the

34

charge of his Honor, nearly all of which were taken too late, but there were one or two that we think are worthy of our consideration, especially, "that the charge consists of abstract propositions of law, without making application of them to the facts of the case," and, "he did not present the case in every aspect, but only in the aspect most unfavorable to the defendant, in singling out Lassiter's testimony, which was contradicted by most all the witnesses, and charging the jury, if they believed Lassiter's testimony the defendant was guilty of murder." In considering the instructions given by his Honor to the jury, the material and prominent question presented is, was it such a charge as comes up to the requirements of the law, in a case of such serious and vital importance to the prisoner? The charge was very long, and was a carefully prepared exposition of the law of homicide.

We find no particular fault with the principles of law as enunciated, but the charge is decidedly obnoxious to the objection of failing to apply the principles to the evidence in the case. For throughout the charge, there is no particular application to the facts of the case, until at the conclusion a reference is made to the testimony of Lassiter, a witness on the part of the State, which is as follows: "If the prisoner killed the deceased, and you are satisfied that it was done in self-defence, you will acquit him. If the prisoner took the life of the deceased unlawfully, and you are satisfied it was done without malice, then it will be your duty to return a verdict of guilty of manslaughter; and if you should find the prisoner killed the deceased with malice aforethought, your duty will be to return a verdict of guilty of murder. If William Powell was holding the deceased, and the prisoner, not in the *furor brevis*, came around behind the crowd, and inflicted the blow, under the circumstances as testified to by the witness Lassiter, then it is murder."

The witness Lassiter was contradicted by several other witnesses, both on the part of the State and defendant, who testified to a state of facts, which, if believed by the jury, made out a case only of manslaughter; but instructions were not asked on

that point, and it is held as a general rule, that an omission on the part of the Judge to charge the jury on a certain point, is not error, unless he is requested to do so. *State* v. *Scott,* 4 Ired., 409 ; *State* v. *O'Neal,* 7 Ired., 251. But when the Judge in his charge to the jury, fails to "state in a precise and correct manner, the evidence given in the case, and explain the law arising thereon," as he is required to do by §413 of The Code, there is error. His Honor has failed to comply with the requirements of this statute. There are so many decisions in our Reports construing this statute, and pointing out the duty of the Courts under its provisions, that we are at a loss to conceive why a Judge should fail to comply with its directions. It is held under the requirements of the statute, to be the duty of the Judge in charging the jury, "to eliminate the material facts of the case, array the facts on both sides, and apply the principles of law to each, so that the jury may decide the case according to the credibility of the witnesses and the weight of the evidence." *State* v. *Dunlap,* 65 N. C., 288 ; *State* v. *Jones,* 87 N. C., 547. And in *State* v. *Matthews,* 78 N. C., 523, the Court say : "We think he (the Judge) is required in the interest of human life and liberty, to state clearly and distinctly the particular issues arising on the evidence and on which the jury are to pass, and to instruct them as to the law applicable to every state of facts, which upon the evidence they may find to be the true one. To do otherwise is to fail to declare and explain the law *arising on the evidence,* as by the act of Assembly he is required to do." C. C. P., §237 ; The Code, §413.

But there is still another error in the charge of his Honor, which is the ground of the defendant's second exception. It consisted of the instruction to the jury, "that if Wilkins Powell was holding the deceased, and the prisoner, not in the *furor brevis,* came around behind the crowd and inflicted the blow, under the circumstances testified by the witness Lassiter, then it is murder." This part of the charge was prejudicial to the prisoner, by giving undue prominence to the testimony of this witness, and was

therefore calculated to mislead the jury, by making an impression upon their minds, as it probably did, that it was his Honor's opinion that more weight was to be given to his testimony than to the other witnesses, whose testimony was in direct conflict with his. For in stating that the prisoner came round the crowd and struck the deceased, and that Powell had hold of Peebles when the prisoner struck him, he is expressly contradicted by Powell, who testified that he did not take hold of Peebles until after he had thrown the prisoner back, and he is corroborated in this statement by McSparrin, Boyce, Person, Fann and Martin, and all of these witnesses contradicted his statement that the prisoner came around the crowd and attacked the deceased.

They concurred in stating that Peebles advanced upon the prisoner, after the first engagement, or went to meet him, and struck him with his left hand.

The instruction was in effect telling the jury, "if you believe the testimony of the witness Lassiter, the prisoner is guilty of murder." He had no right to give such a charge. It was clearly error. A Judge has no right thus to single out one witness, and instruct the jury if they believe him, they should find in a particular way, and more especially is it erroneous when the testimony is conflicting, and there are divers witnesses. *Anderson* v. *Steamboat Co.*, 64 N. C., 399; *Jackson* v. *The Commissioners,* 76 N. C., 282; *Brem* v. *Allison,* 68 N. C., 412.

And when there is a conflict of testimony which leaves a case in doubt before a jury, and the Judge uses language which may be subject to misapprehension, and is calculated to mislead, this Court will order a *venire de novo*. *State* v. *Bailey*, 1st Winston, 137. Accordingly, a *venire de novo* is ordered in this case, and to that end this opinion must be certified to the Superior Court of Northampton county.

Error.                                        Reversed.